**Martha MILLS, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 82-2583.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1983.

Decided July 14, 1983.

As Amended July 18, 1983.

Michael L. Shakman, Krupp & Miller, Chicago, Ill., for plaintiff-appellant.

Howard S. Scher, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before COFFEY, Circuit Judge, and SWYGERT and FAIRCHILD, Senior Circuit Judges.

COFFEY, Circuit Judge.

The issue on this appeal is whether the Criminal Justice Act of 1964, 18 U.S.C. section 3006A (1976), grants the Judicial Council of the Seventh Circuit the statutory authority to increase the maximum hourly fees payable to court appointed counsel in the absence of a local bar association minimum fee scale. The district court for the Northern District of Illinois, 547 F.Supp. 116, found that the Judicial Council for the Seventh Circuit was without statutory authority to increase the maximum hourly fees. We affirm.

I.

The Criminal Justice Act of 1964, 18 U.S.C. section 3006A(d)(1), as amended by Congress in 1970, provides:

"Hourly rate.—Any attorney appointed pursuant to this section or a bar association or legal aid agency or community defender organization which has provided the appointed attorney shall, at the conclusion of the representation or any segment thereof, be compensated at a rate not exceeding $30 per hour for time expended in court or before a United States magistrate and $20 per hour for time reasonably expended out of court, or such other hourly rate, fixed by the Judicial Council of the circuit, not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district. Such attorney shall be reimbursed for expenses reasonably incurred, including the costs of transcripts authorized by the United States magistrate or the court."

On December 18, 1981, the Judicial Council for the Seventh Circuit, acting on the recommendation of the Bar Association of the Seventh Federal Circuit,[1] voted to increase the maximum fees payable to attorneys appointed under the Criminal Justice Act in the Seventh Circuit from $30 to $55 per hour for time spent in court or before a magistrate and from $20 to $45 per hour for out-of-court time, with the increased hourly rates to apply to legal work performed after January 1, 1982.[2] At the time the Judicial Circuit voted to increase the hourly fees, there was no bar association minimum fee scale in effect in any of the federal judicial districts within the Seventh Judicial Circuit and none had been established subsequently.

The plaintiff Martha Mills, an attorney engaged in the private practice of law, was appointed pursuant to the Criminal Justice Act to represent a defendant in a criminal case in the district court for the Northern

---

1. A copy of the Bar Association recommendation is not contained in the record.

2. None of the panel members deciding the present appeal participated in the Judicial Council action under review.

District of Illinois. At the conclusion of her representation of Dobbs, Attorney Mills submitted a bill for payment to the United States Magistrate in the amount of $127.50, computed on the basis of the new $55/45 per hour rate established by the Judicial Council. The Magistrate approved Mills' fee request, and the bill approved for payment was submitted to the Administrative Office of the United States Courts.

The Administrative Office refused to pay the full amount of Mills' fee request, stating in a letter:

"It is the position of this office that we do not have the authority to reimburse attorneys for services provided defendants proceeding under the Criminal Justice Act in excess of those maximum hourly rates prescribed by the Act. We are bound by the statutory maximum of $30 per hour for in-court service and $20 per hour for out-of-court service as specified in 18 U.S.C. 3006A(d)(1)."

Mills then filed suit in the district court seeking an order compelling the government to pay the $127.50 bill for services computed on the new $55/45 maximum hourly rates. Both the plaintiff and the defendant moved for summary judgment, and the court granted summary judgment in favor of the government, finding that in the absence of a bar association minimum fee scale, the Judicial Council was without statutory authority to increase the maximum hourly rates set forth in the Criminal Justice Act, 18 U.S.C. section 3006A(d)(1). The plaintiff Mills appeals from this determination.

## II.

The Criminal Justice Act (CJA) as originally enacted in 1964 provided that attorneys be compensated at a rate not exceeding $15 an hour for time spent in court and not exceeding $10 an hour for out-of-court time. In 1970, Congress amended the CJA by increasing the maximum hourly rates and by granting judicial councils the authority to set hourly rates "not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district." Five years later, however, the Supreme Court in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) held that a minimum fee schedule promulgated and enforced by a bar association constitutes unlawful price fixing in violation of the Sherman Act. In the wake of the *Goldfarb* decision, minimum fee schedules have been abolished in the states encompassed within the Seventh Circuit. Therefore, the issue in this case is whether the Judicial Council for the Seventh Circuit had the authority to raise the hourly rates payable under the CJA to levels above those prescribed in the statute, in the absence of local bar association fee schedules.

### A.

In interpreting a statute, we first look to the language of the statute itself. *Greyhound v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Both parties in this lawsuit argue that the language "not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district", is clear and unambiguous. However, the parties come to opposite conclusions as to what the "plain language" of the statute means. The plaintiff contends that the clear language of the statute demonstrates that a local bar association fee scale is not a condition precedent to a judicial council raising the hourly rates under the Criminal Justice Act. On the other hand, the defendant asserts that the clear language of the statute mandates an opposite conclusion, namely that before the Judicial Council could act to modify the hourly rates payable under the Act, a local bar association minimum hourly fee schedule must exist. While the statutory language does clearly state that if a bar association minimum fee scale exists, the Judicial Council may not set hourly rates higher than those provided in the bar association schedule, we believe the *language of the statute itself* does not definitively answer the question presented in this case. Although we find more persuasive the defendant's argument that the statutory language

contemplates the existence of a minimum fee schedule before the Judicial Council is empowered to raise or lower the hourly rates, we believe that the language of the statute requires interpretation.

Having determined that the language of the statute itself leaves something to be desired and fails to categorically set forth whether a judicial council is authorized to raise hourly rates under the CJA in the absence of a local bar association minimum fee schedule, we next turn to the legislative history of the Act. "When faced with two possible interpretations of a statute, it is appropriate for a court to rely on the legislative history of the statute." *United States v. Noe,* 634 F.2d 860 (5th Cir.), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1981).

■ The statutory language authorizing judicial councils to adjust the hourly rates payable under the Criminal Justice Act was added to the Act by the House Committee on the Judiciary. Generally, committee reports represent the most persuasive indicia of Congressional intent (with the exception, of course, of the language of the statute itself). *Housing Authority of Omaha v. U.S. Housing Authority,* 468 F.2d 1 (8th Cir.1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973); *United States v. Curtis-Nevada Mines, Inc.,* 611 F.2d 1277 (9th Cir.1980). The Judiciary Committee's report stated in part:

> "The Committee amendment accordingly authorizes judicial councils to establish alternative maximums not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district. These could be set by the judicial council of the circuit where the $30 and $20 maximums are grossly disproportionate. By the same token, the reference to minimum rates set locally by bar associations should serve to remind judicial council that, in setting rates within the $30 and $20 maximums, lower local rates set by bar associations should be taken into account."

H.R.Rep. No. 1546, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.

News 3982, 3990. In urging the bill's passage in the House of Representatives, Representative Kastenmeier stated:

> "Nothing in the legislation delegates the authority of Congress to determine rates of compensation to local bar associations. Rates of compensation and maximum amounts of compensation are to be fixed by the judicial councils *within maximums prescribed by Congress ....* If in a particular case the judicial council feels that the hourly maximums are inadequate, it is *nevertheless limited to minimum rate, if any, set by a bar association.*
>
> "Comparably, where bar association minimums are lower than the $30 to $20 maximums, these bar association minimums should serve to remind the judicial council that in setting appropriate rates within the $30 to $20 maximums, the lower bar association rates are relevant."

116 Cong.Rec. 34811 (1970). In response to Kastenmeier's statements, Representative Gross asked, "Why do you set up $30 an hour, $20 an hour, and then turn around and say in the same breath that the judicial council can change it if it wants to?" Representative Kastenmeier answered:

> "The other amendment is an exceptional provision, not to be generally used. It provides that the Judicial Council of the Circuit, where literally the Criminal Justice Act is unworkable some sort of additional compensation, may fix a rate not more than the local bar association rate.
>
> "That, as I said, is an exceptional provision, but we regard it as a sort of safety valve for some cases to avoid an inequity and disservice to the Act."

\*    \*    \*    \*    \*    \*

> "Mr. Gross. Could not the bar association establish a minimum above the figure set forth in the bill? The minimums might well be higher than the figures set forth in the bill.
>
> Mr. Kastenmeier. It could be higher, or it could be lower."

*Id.* at 34812.

■ The House Judiciary Committee Report quoted above contains language sug-

gesting that the judicial council has authority only to set rates lower than those prescribed in the Act ("the reference to minimum rates set locally by bar associations should serve to remind judicial councils that, in setting rates *within* the $30 and $20 maximums, lower rates set by bar associations should be taken into account"). However, in this appeal the government has chosen not to argue this interpretation, and we believe this interpretation is belied by the remarks of Representative Kastenmeier, the floor manager of the bill, stating that the hourly rates established by a local bar association "could be higher, or ... could be lower." Representative Kastenmeier's remarks are entitled to substantial weight since he acted as floor manager of the bill. *Pan Am World Airways, Inc. v. Civil Aeronautics Board,* 380 F.2d 770 (1967), aff'd. sub nom. *World Airways Inc. v. Pan Am World Airways, Inc.,* 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968); *N.L.R.B. v. Fruit and Vegetable Packers and Warehousemen, Local 760,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (sponsor of bill).

The legislative history of the Criminal Justice Act also demonstrates that Congress intended to retain ultimate control over the hourly rates payable under the Act. In introducing the legislation before the House of Representatives, Representative Kastenmeier clearly stated that *"[n]othing in the legislation delegates the authority of Congress* to determine rates of compensation to local bar associations. Rates of compensation are to be fixed by the judicial councils *within maximums prescribed by Congress"* (emphasis added). Moreover, the legislative history is equally clear that Congress intended to grant judicial councils only limited authority to adjust the hourly rates set forth in the Act, and that this limited authority was to be exercised only within the framework of the local bar association minimum fee schedule. Representative Kastenmeier referred to the Act's grant of authority to adjust the hourly rates as "an exceptional provision, not to be generally used" and stated that, in adjusting the hourly rates, the judicial council is "nevertheless limited to minimum rates, if any, set by a bar association." The Judiciary Committee Report is similarly replete with references to local bar association minimum fee schedules as limitations on a judicial council's authority, stating that the hourly rates set by the judicial council were "not to exceed the minimum hourly scale established by a bar association" and that "in setting rates ... local rates set by bar associations should be taken into account." Based on our review of the legislative history of the Criminal Justice Act, it is evident that Congress intended the discretion of a judicial council to be limited by a specific standard—the bar association minimum fee schedule—and that Congress presumed that such a fee schedule would exist before a judicial council would be authorized to increase or decrease the hourly rates.[3]

### B.

Having determined that the legislative history of the Criminal Justice Act

---

**3.** The dissent points out that Congress was aware, at the time of the proposed amendment to the CJA, that only 46 states had minimum fee schedules. We fail to understand how this information strengthens the dissent's position since it is our view that judicial councils are without authority under the CJA, to modify the compensation rates prescribed in that Act in any state lacking a minimum fee schedule.

In footnote 2 of his dissent, Judge Swygert takes issue with the above-mentioned lack of judicial council authority in the four states having no minimum fee schedules. He asserts that this is contrary to "the generally accepted principle that Congress normally intends that its laws shall operate uniformly throughout the

nation so that the federal program will remain unimpaired." Dissent at 1257 n. 1, *quoting Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 209, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1945). This general principle is inapplicable to the present case, however, since Congress *itself* gave judicial councils the power to change the "federal program" if certain conditions were met. The reimbursement amounts were not expected to remain uniform across the country. Therefore, the fact that judicial councils are without authority to change the reimbursement amount in the four states lacking minimum fee schedules is not contrary to the above-mentioned general principle of statutory interpretation.

demonstrates that a judicial council has authority to raise or lower the minimum hourly rates only if a local bar association minimum fee schedule exists, it is also appropriate for us to consider: (1) rules of statutory construction; and (2) policy considerations weighing for or against a particular construction of the statute. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). As noted above, it is clear from the legislative history that Congress delegated only *limited* authority to the judicial councils to adjust the hourly rates payable to attorneys under the CJA. The limitation imposed on the judicial council's authority was that any hourly rate was "not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district." However, the Supreme Court's decision in the *Goldfarb* case has rendered inoperative this limiting provision dealing with bar association minimum fee schedules, since *Goldfarb* held that bar association minimum fee schedules (at least when not purely advisory) violate the Sherman Antitrust Act.

If we were to adopt the position advocated by the plaintiff in this case, judicial councils would be left with virtually unrestrained authority to increase or decrease the maximum hourly rates, without guidelines or standards. We believe such an interpretation of the statute is unwarranted.

First, it is a well-established principle of statutory construction that if the qualifying portion of a statute is rendered inoperative, such a holding should not serve to extend the scope of the authority which the statute grants. For example, the Supreme Court in *Davis v. Wallace,* 257 U.S. 478, 42 S.Ct. 164, 66 L.Ed. 325 (1922) stated that "[W]here an excepting provision in a statute is found unconstitutional, courts very generally hold that this does not work an enlargement of the scope or operation of other provisions with which that provision was enacted and which it was intended to qualify or restrain." In this case, the Act's "excepting provision" (reference to local bar association minimum fee schedules) has

been rendered generally inoperative by the Supreme Court in *Goldfarb* and that holding certainly cannot serve to expand the scope of the limited authority granted to judicial councils by Congress. Similarly, this court in *Quinn v. Comm. of Internal Revenue,* 524 F.2d 617, 626 (7th Cir.1975) recited that "when a section of a statute is declared void, the statute cannot be given effect as though the legislature had not enacted the conditions limiting its operation." *See also U.T. Inc. v. Brown,* 457 F.Supp. 163, 170 (W.D.N.C.1978) ("it is a cardinal rule of construction that where an excepting clause or restriction is found unconstitutional the substantive provisions it qualifies cannot stand. The court will not assume that the legislative body would have enacted the ordinance without the exceptions, nor can the court determine how the substantive provisions of the ordinance might otherwise have been modified had it been known the exceptions would be found unconstitutional.")

This principle of statutory construction was applied by the United States Court of Appeals for the Fourth Circuit in *McCorkle v. United States,* 559 F.2d 1258 (4th Cir. 1977), in deciding an issue analogous to the one in this case. In *McCorkle,* the court considered language of a provision in the Federal Salary Act of 1967 which provided that salary recommendations by the President submitted to Congress will become effective "but only to the extent that" between the submittal and the effective date no other rate has been enacted into law and/or neither House of Congress has enacted legislation disapproving of the presidential salary recommendations. The court concluded that if the provision, in effect enabling one House of Congress to veto a presidential recommendation, was unconstitutional, the President would not have the authority to establish salaries pursuant to that section of the Federal Salary Act in question. In explaining this conclusion, the court stated: "when the questioned clause restricts a power granted by the Legislature, the case against severance is strong. *Otherwise the scope of the power would be enlarged beyond the Legislature's intent."*

559 F.2d at 1261 (emphasis added). The "not to exceed" language of the Criminal Justice Act is analogous to the "but only to the extent" language in question in *McCorkle* since both are intended to act as a strict limitation on a delegation of Congress' authority to another branch of government. Here, as in *McCorkle,* Congress placed a limit on the power granted and the invalidity of the standard imposed (bar association minimum fee schedules) cannot serve to expand the scope of the power granted, and cannot defeat Congress' intent in setting a specific limitation on a judicial council's authority to adjust the hourly rates.[4]

Second, in another provision of the Criminal Justice Act, 18 U.S.C. section 3006A(d)(2), Congress set forth maximum amounts payable under the CJA for an individual case.[5] However, in section

4. Judge Swygert states in footnote 2 of his dissent that he need not reach the preceding question of severability because he finds the *Goldfarb* mandate inapplicable to the CJA. His position seems to be that a purely advisory fee schedule would satisfy the Act. He then continues to question the requirement of an established fee schedule like that found in *Goldfarb* in the paragraph immediately following footnote 2 of his dissent. While we do not decide whether a purely advisory fee schedule would be an adequate predicate for action by a judicial council under section 3006A(d)(1) because we do not believe the Seventh Circuit Bar Association's recommendation to the Judicial Council falls within the meaning of "minimum hourly scale" as set forth in the Act, *see infra* footnote 6, we believe some response to the dissent's argument is required.

In *Torti v. United States,* 249 F.2d 623 (7th Cir.1957) this Court stated:

"Where words are susceptible of several meanings, the court is at liberty to determine from the legislative history and surrounding circumstances the sense in which the words were used in the statute."

*Id.* at 625, *quoting Gellman v. United States,* 235 F.2d 87, 93 (8th Cir.1956). At the time of the proposed amendment to the CJA in 1970, as was true in the factual scenario facing the Supreme Court in *Goldfarb* in 1975, the practice of habitually charging "fees less than those established in suggested or recommended minimum fee schedules ..." was considered evidence of unethical conduct. Opinion 302 of the Professional Ethics Committee of the American Bar Association, *reprinted in* American Bar Association, *Minimum Fee Schedules* 12, 13 (1970). The *Minimum Fee Schedules* publication also recommended placing "a strong ethical injunction against solicitation of clients by habitual fee-cutting" in the forward of any proposed fee schedule. *Minimum Fee Schedule* at 15. With the foregoing as background, it is unlikely that minimum fee schedules existing at the time of the amendment differed from that established by the Fairfax County Bar in *Goldfarb* in terms of their enforcement mechanisms. Thus, when Congress was considering the 1970 amendment to the CJA, minimum fee schedules were obviously enforced through ethical standards promulgated by state bar associations or state supreme courts. Therefore, fee schedules carrying ethical sanctions for habitual noncompliance were probably "the sense in which the words (minimum hourly scale) were used" when Congress enacted the 1970 amendment to the CJA. *Goldfarb* is thus not inapplicable, as the dissent asserts, since its mandate clearly outlawed minimum fee schedules which were not "purely advisory." The error in the dissent's reasoning regarding the applicability of *Goldfarb is in its focus on the recommendation* rather than on the circumstances existing at the time of the enactment of the 1970 amendment to the CJA.

In response to the dissent's argument that it is "illogical to assume that the statute depends upon a *Goldfarb* schedule for its validity where the necessary predicate for such a schedule, membership in a state bar association, was specifically rejected by Congress," it should be noted that bar association membership, i.e., an integrated bar, is not a prerequisite to a state supreme court's or other governing body's ability to sanction attorneys for unethical conduct. State supreme courts or other governing bodies in states lacking integrated bars have been able to sanction lawyers, practicing before their courts, for malpractice or misconduct. Since the enforcement mechanism existing in *Goldfarb* can also exist in states not having an integrated bar, it is the dissent's position which is illogical when he asserts that for *Goldfarb* to validly apply to section 3006A(d)(1) the sponsors would have had to have contemplated making the bar membership mandatory. The Supreme Court in *Goldfarb* outlawed fee schedules which carry ethical sanctions for habitual noncompliance, it was not concerned with the means by which those sanctions were or could be imposed. Thus, the dissent's argument in this regard is without merit.

5. 18 U.S.C. Section 3006A(d)(2) recites:

"(2) Maximum amounts.—For representation of a defendant before the United States magistrate or the district court, or both, the compensation to be paid to an attorney or to a bar association or legal aid agency or community defender organization shall not exceed $1,000 for each attorney in a case in

3006A(d)(3), Congress provided for the waiver of the overall maximums, but in doing so, Congress set specific guidelines and standards to be employed by the court in determining whether a waiver of the statutory maximums is justified; the representation must have been extended or complex, and the excess payment must be found necessary to provide fair compensation. Furthermore, any waiver of the statutory maximum must be submitted to the chief judge of the circuit for approval. Thus, sections 3006A(d)(3) and (2) are an indication that Congress intended to retain control over expenditures under the Act and that where Congress intended to allow the maximum fees payable under the CJA to be increased, *it set specific standards to be considered* by the court subject to the additional safeguard of review by the chief judge of the circuit. Therefore, it is clear that Congress did not intend to give judicial councils open-ended authority to increase or decrease the *hourly* rates, without reference to any standard or guideline, but rather intended to grant judicial councils limited authority to be exercised only when there exists a local bar association minimum fee schedule and "where literally the Criminal Justice Act is unworkable."

### III.

■■■ We conclude that, under 18 U.S.C. section 3006A(d)(1), the judicial council lacked authority to raise or lower the hourly rates payable to attorneys accepting appointments under the CJA in the absence of a local bar association minimum fee schedule.[6] Although we reach this conclusion, we recognize that as a result of more than a decade of inflation, the hourly rates set in 1970 are no longer realistic today. However, it is important to remember that the Criminal Justice Act was never intended to provide full compensation for an attorney's services or to provide fees equal to those charged in private practice. Rather, a lawyer's *pro bono publico* obligation was also meant to act as an incentive for attorneys to accept appointments under the CJA. As the report of the House Judiciary Committee states:

> "This compensation was intended to ease the financial burden on the attorney, who offers his services to a defendant as a professional public duty. The level of fees established under the Act was intended to offer some but not full compensation for the appointed attorney and to provide adequate defense services for his client."

H.R.Rep. No. 1546, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 3982, 3984. Similarly, in adopting its plan to implement the provisions of the CJA in 1971, the Judicial Council for the Seventh Circuit stated:

> "The payment of compensation to counsel under the Act, in most cases, probably will be something less than compensatory. Service of counsel by appoint-

---

which one or more felonies are charged, and $400 for each attorney in a case in which only misdemeanors are charged. For representation of a defendant in an appellate court, the compensation to be paid to an attorney or to a bar association or legal agency or community defender organization shall not exceed $1,000 for each attorney in each court. For representation in connection with a post-trial motion made after the entry of judgment or in a probation revocation proceeding or representation provided under subsection (g) the compensation shall not exceed $250 for each attorney in each proceeding in each court."

**6.** We reject the plaintiff's contention that the Seventh Circuit Bar Association's recommendation that Judicial Council raise the hourly rates constitutes a "minimum hourly scale established by a bar association" within the meaning of the CJA. Our review of the legislative history demonstrates that, in limiting the judicial council's authority to increase or decrease the hourly rates proscribed by the Act, Congress contemplated the existence of an established minimum fee schedule like that involved in *Goldfarb,* rather than an ad-hoc recommendation to a judicial council. We recognize that the Supreme Court in *Goldfarb* reserved the question of whether "a purely advisory fee schedule issued to provide guidelines" would constitute price fixing. 421 U.S. at 781, 95 S.Ct. at 2010. As we stated in footnote 4, in the case before us we have no occasion to decide whether a purely advisory bar association fee schedule would be a predicate for action by a judicial council under section 3006A(d)(1).

ment under the Act will continue to require a substantial measure of dedication and public service. The responsibility of members of the bar to accept appointments and to serve in these cases is the same as it traditionally has been in the past and is in no way lessened by the passage of the Act. We have complete confidence in the professional integrity of the bar to fulfill this responsibility." [7]

Therefore, it is evident that both Congress and the Judicial Council for the Seventh Circuit recognized that the Criminal Justice Act was intended to provide "some but *not full* compensation for the appointed attorney", and that representation of indigent defendants under the Act would "require a substantial measure of dedication and public service."

This court recently discussed "the recognized ethical responsibilities of each lawyer engaged in the practice of law to provide public interest legal services without a fee."

"There has been increasing consideration given to the *social responsibility* of lawyers to provide *pro bono publico* services. In 1975 the American Bar Association House of Delegates explicitly reaffirmed the professional obligation of each lawyer to provide public interest services and there currently exists serious discussion on mandating a minimum service as part of the proposed Rules of Professional Conduct. *Ray v. Robinson,* 640 F.2d 474, 478–79 (3d Cir.1981). *See also Scott v. Plante,* 532 F.2d 939, 949–50 (3d Cir. 1976); *Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir.1971). *Accord, Powell v. Alabama,* 287 U.S. 45, 73, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932) ("Attorneys are officers of the Court, and are bound to render

services when required by such an appointment.").

\* \* \* \* \* \*

"The bar within this Circuit has long viewed appointments of counsel as part of its professional duty to provide public service. We have faith that lawyers always will be found who are willing to represent the indigent without remuneration.

\* \* \* \* \* \*

"*Pro bono publico* work is an established tradition and it is up to the district courts to tap the reservoir of talent that exists within this Circuit."

*Caruth v. Pinkney,* 683 F.2d 1044, 1049 (7th Cir.1982). Similarly, the Eighth Circuit in *Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir.1981) stated:

"Lawyers have long served in state and federal practice as appointed counsel for indigents in both criminal and civil cases. The vast majority of the bar have viewed such appointments to be integrally within their professional duty to provide public service.... We have the utmost confidence that lawyers will always be found who will fully cooperate in rendering the indigent equal justice at the bar."

In recognition of the *pro bono publico* obligations of attorneys, the District Court for the Northern District of Illinois has recently promulgated a local rule requiring members of its trial bar to be available for one *pro bono publico* appointment each year. Local Rule 3.31, Northern District of Illinois.[8]

We are sympathetic with efforts to increase the inadequate hourly rates now payable to appointed counsel under the Crimi-

---

**7.** The Plan of the United States Court of Appeals for the Seventh Federal Circuit to Supplement the Plans of the Several United States District Courts within the Seventh Circuit, pursuant to the Criminal Justice Act of 1964, Title XVIII U.S.C. section 3006A (adopted 1971).

**8.** Local Rule 3.31 states:
"Rule 3.31. Duty of Trial Bar to Accept Appointments.
   In testimonial proceedings (as defined in General Rule 3.00C(1) of these Rules) arising

out of matters pending before this Court, every member of the trial bar shall be available for appointment by the court to represent or assist in the representation of those who cannot afford to hire a member of the trial bar. Appointments under this Rule shall be made in a manner such that no member of the trial bar shall be required to accept more than one appointment during any twelve (12) month period."

nal Justice Act. However, the fact that the $30–$20 hourly rates set forth in the CJA have become inadequate as a result of the vicissitudes of inflation does not make the statute mean something in 1983 it did not mean in 1970. Congress imposed limits on a judicial council's authority to raise the hourly rates set forth in the CJA. Therefore, it is the role of Congress, and not the judiciary, to amend the statute to comport with the economics of legal practice in the 1980's. "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *United States v. Rutherford,* 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). "Economic exigencies ... do not grant the courts a license to rewrite a statute no matter how desirable the purpose or result might be." *West Virginia Div. of Izaak Walton L. of Am., Inc. v. Butz,* 522 F.2d 945, 955 (4th Cir.1975). Congress, unlike the federal courts, has the power to conduct hearings, commission studies and consider the views of interest groups in determining the appropriate level of compensation for attorneys appointed under the Criminal Justice Act, taking into account factors such as increases in the cost of living since 1970 as well as the federal government's budgetary constraints. We trust that Congress will give a high priority to amending the Criminal Justice Act to provide realistic compensation for appointed attorneys.

We hold that the Judicial Council for the Seventh Circuit lacked authority to raise the hourly rates prescribed in the Criminal Justice Act, in the absence of a local bar minimum fee schedule. Therefore, the judgment of the district court is affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

Section 3006A(d)(1) of the Criminal Justice Act of 1964, 18 U.S.C. § 3006A (1976) ("the Act"), provides that appointed counsel be compensated "at a rate not exceeding $30 per hour for time expended in court or before a United States Magistrate and $20 per hour for time expended out of court."

This section also empowers the Judicial Council of each circuit to fix compensation at "such other hourly rate, ... not to exceed the minimum hourly scale established by a bar association for similar services rendered in the district." *Id.* In response to the recommendation of a bar association, the Bar Association of the Seventh Federal Circuit, the Judicial Council of the Seventh Circuit approved an increase in fees from $30 to $55 per hour for time spent in court and from $20 to $45 per hour for time spent out of court.

Although the majority purports to recognize "policy considerations weighing for or against a particular construction of the statute," it inexplicably travels a rather tortuous and selective journey to hold that the Judicial Council lacked authority to increase the hourly rates paid to court-appointed attorneys under the Act. The majority's conclusion necessarily rests on the following premises: first, that the existence of a local bar association minimum fee scale is a condition precedent to the Judicial Council's authority to alter hourly rates; second, that only a fee scale of the type held violative of the antitrust laws in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), will suffice; and third, because *Goldfarb* invalidated such fee scales, this section of the Act has been voided, and it is up to Congress to amend the Act. Because my review of the Act and its legislative history reveals no support for the first two assumptions, because the third need not be reached, and because in any view the majority's holding ignores the well settled tenet that "in interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute and the objects and policy of the law," *Brown v. Duchesne,* 19 How. 183, 194, 15 L.Ed. 595 (1857), *quoted in Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2025–26, 76 L.Ed.2d 157 (1983), I respectfully dissent.

I

The majority correctly notes that the starting point is the language of the statute itself. Section 3006A(d)(1) authorizes a Ju-

dicial Council to set compensation at "such other hourly rate," and that this rate may not "exceed the minimum hourly scale established by a bar association for similar services rendered in the district." Following a selective review of this section's legislative history, the majority concludes that "Congress presumed that such a fee schedule would exist before a Judicial Council would be authorized to increase or decrease the hourly rates." Although I concede that the legislative history is far from clear, and that it may appear the majority and I are merely emphasizing different portions of legislative history, I do so in favor of "a construction that bestows the benefits of the Act on those for whom it was chiefly intended." *Ralpho v. Bell,* 569 F.2d 607, 608 (D.C.Cir.1977).

At the outset, it is clear Congress was well aware that not all jurisdictions had established minimum fee scales. The report from the Committee on the Judiciary notes that "[a] 1970 publication of the American Bar Association, entitled 'Minimum Fee Schedules,' indicates . . . that 46 States have minimum hourly rates for legal office work set by bar associations and that in 20 of these States the minimum is less than $20."[1] H.R.Rep. No. 1546, 91st Cong., 2d Sess. 9, *reprinted in* 1970 U.S.Code Cong. & Ad.News 3982, 3990. The recognition that Congress understood not all districts had minimum fee scales serves to put the various remarks made by the bill's sponsors in perspective. For example, Representative Kastenmeier, upon whose comments the majority places great weight, stated that "[i]f in a particular case the judicial council feels that the hourly maximums are inadequate, it is nevertheless limited to [a] minimum rate, *if any,* set by a bar association." 116 Cong.Rec. 34, 811 (1970) (emphasis added).

The majority's conclusion that a Judicial Council is powerless absent a bar association fee scale results in large part from its perception that Congress feared delegating such spending power to the Judicial Councils. I find this concern unsupportable for two reasons. First, it is apparent that Congress declined to empower bar associations with discretion to set appropriate fees. Again, it was Representative Kastenmeier who explained that "[n]othing in the legislation delegates the authority of Congress to determine rates of compensation to *local bar associations."* 116 Cong.Rec. 34,811 (1970) (emphasis added). *See also* remarks of Representative Biester, *id.* at 34,812 ("It should also be pointed out that the *Judicial Council* has the power under this language, and not a local bar association.") (emphasis added). The majority's insistence that a fee scale is a condition precedent delegates to a bar association exactly this type of control: in areas where the statutory rates of $20 and $30 per hour were in fact *higher* than the "going rate," there would be little incentive for a bar association to establish a fee scale which would allow the Judicial Council to lower compensation. And under the majority's analysis, the Council would be unable to act in the absence of such a scale. This result is directly contrary to the expressed purpose of the amendment, which was to ensure "that the bill is neither a bonanza for some lawyers to get more than the going rate in that town, nor an empty shell which will not be used because the rates are below the going charge in those towns." *Id.* (remarks of Rep. [now Circuit Judge] Mikva).

Second, the majority's concern that "judicial councils would be left with virtually unrestrained authority to increase or decrease the maximum hourly rates," *see ante* at 1256, loses considerable force when viewed in conjunction with the virtually unrestrained authority delegated to the judiciary under other sections of the Act. For example, the Judicial Council is charged with supervisory power over district courts to implement the Act (section 3006A(a)), is

---

1. The majority, in footnote 3, *ante,* "fail[s] to understand" how congressional awareness that not all states had fee schedules supports my position, and simply finds that the Act would not be operative in such states. This interpretation, however, is contrary to "the generally accepted principle that Congress normally intends that its laws shall operate uniformly throughout the nation so that the federal program will remain unimpaired." *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 209, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1945).

authorized to "supplement the plan with provisions for representation on appeal" (*id.*), and may direct the district courts to modify any aspect of the plan (*id.*). The district court has discretion to appoint counsel in any case where "the interests of justice so require," (section 3006A(g)), and, with the approval of the chief judge of the circuit, may waive the maximum compensation limit of the Act (section 3006A(d)(3)). I suspect that any number of choices made by a Judicial Council or a district court under the above provisions would have an equal impact on the money spent to ensure representation of criminal defendants as would raising the hourly compensation.

The majority points to the waiver provision in section 3006A(d)(3) as proof that "Congress intended to retain control over expenditures under the Act" because this section provides "specific guidelines and standards" for when waiver is appropriate. I find, however, that a standard such as "necessary to provide fair compensation" still "leave[s] something to be desired," *United States v. Bailey,* 581 F.2d 984, 989 (D.C.Cir.1978), and in the final analysis must still be viewed "by everyday judicial experience." *Id.* I conclude that the statute delegates authority to modify the hourly rates to the Judicial Council, and that this authority was not intended to be circumscribed by a local bar association.

## II

Even assuming that an hourly scale established by a bar association is a condition precedent to raising the rates paid under the Act, in my view the issue in this case is whether the recommendation from the Bar Association of the Seventh Federal Circuit to the Judicial Council satisfies this condition. In answering this question in the negative, the majority appears to embrace

alternative theories: first, that *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), rendered all fee schedules invalid under the Sherman Act; and, second, that in the absence of a *Goldfarb* schedule, the Judicial Council is stripped of its authority to alter the hourly fees payable under the Act.

In my view, the first assumption requires little discussion. The majority finds that "[i]n the wake of the *Goldfarb* decision, minimum fee schedules have been abolished . . . ." *Ante* at 1251. The fee schedule at issue in *Goldfarb,* however, "was enforced through the prospect of professional discipline from the State Bar, and the desire of attorneys to comply with announced professional norms." 421 U.S. at 781, 95 S.Ct. at 2010. The Supreme Court expressly noted that "[a] purely advisory fee schedule issued *to provide guidelines,* or an exchange of price information without a showing of an actual restraint on trade, would present us with a different question." *Id.* (emphasis added). In this case, no one alleges that the recommendation from the Bar Association of the Seventh Federal Circuit was binding on any attorney, much less that this association has any power or intent to enforce such a recommendation. For those reasons, I find *Goldfarb* inapplicable.[2]

The issue then becomes whether the recommendation to the Judicial Council constitutes a "minimum hourly scale established by a bar association for similar services rendered in the district" as intended under the Act. The majority finds that "the legislative history demonstrates that . . . Congress contemplated the existence of an established minimum fee schedule like that involved in *Goldfarb,*" *ante* at 1256 n. 6, yet no demonstrations of such legislative history are supplied. Apart from my reluctance to attribute to Congress prophetic

---

**2.** Even granting arguendo that the existence of a fee schedule is a condition precedent for action by the Judicial Council, I therefore need not reach the question of severability the majority feels compelled to address. It is compelled because of its view that only an illegal fee schedule can satisfy the statute, a view not only refuted by the discussion above, but at odds with the familiar principle that statutes should be construed so as to be effective. *See*

*FTC v. Manager, Retail Credit Co.,* 515 F.2d 988, 994 (D.C.Cir.1975) ("The presumption against interpreting a statute in a way which renders it ineffective is hornbook law."). Because under my interpretation the statute can be satisfied by a legal fee schedule (assuming the necessity of such a schedule), the question whether a statute whose condition precedent is always illegal should be saved by severing the illegal condition does not arise.

and self-destructive powers such that in 1970 the sole type of fee scale it contemplated was the type five years later to be held invalid in *Goldfarb,* I am unable to discern any indication from the legislative history of this section that only an enforced, mandatory fee schedule would trigger the authority of the Judicial Council to increase hourly fees. To the contrary, all indicia of legislative intent lead to the conclusion that the recommendation furnished in this case is precisely the kind of local, advisory input required under the statute.

The crucial underpinning of the Supreme Court's decision in *Goldfarb* was the fact that the state bar association had both the power to enforce the minimum fee schedule and apparently little reservation in wielding that power. A necessary corollary of this finding is that the attorneys subject to this disciplinary power were members of the Virginia State Bar Association, for the state bar association would have no control over the fees charged by attorneys not licensed in that state. It follows, then, that if the sponsors of section 3006A(d)(1) indeed contemplated the existence of a *Goldfarb* fee schedule (as the majority holds), they would have made membership in a state bar association mandatory. The legislative history of the Act refutes this reasoning. As pointed out above, Congress was aware that not all states had established minimum fee schedules. Moreover, Representative Kastenmeier expressly rejected the suggestion that bar membership was a prerequisite to compensation under the Act. In response to the question whether "an attorney who is going to participate in this system has to belong to the bar in the State in which he is practicing," Representative Kastenmeier replied that "[t]here is no provision in this bill establishing that as a matter of practice," and that "[t]his would be a matter entirely up to the Court." 116 Cong.Rec. at 34,813. It is therefore illogical to assume that the statute depends upon a *Goldfarb* schedule for its vitality where the necessary predicate for such a schedule, membership in a state bar association, was specifically rejected by Congress.

Finally, any mention of the statute's requirement of an "hourly scale" reveals an extremely liberal use of that term. It is referred to as a "bar association rate," the "going rate," and a rate "left to the judge, not to the bar association, and it is hoped it will in fact reflect what the private practitioner charges in those jurisdictions." *Id.* at 34,812 (remarks of Rep. Mikva). I conclude that the recommendation given the Judicial Council in this case is an "hourly scale" as used in this section for "similar services rendered."

### III

In summary, I find that section 3006A(d)(1) authorizes the Judicial Council to increase hourly rates paid attorneys appointed under the Act, and that this authority is limited only by a minimum hourly scale, "if any." Furthermore, even assuming that a fee scale need exist for the Judicial Council to act, I conclude that the recommendation of the Bar Association of the Seventh Federal Circuit was sufficient. I therefore dissent.